## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID L. BURG *and* ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, <br><br> PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, <br><br> RAYMOND S. SANTIAGO, in his official capacity as Monmouth County Prosecutor, <br><br> ANTHONY DZUGAN, individually and in his official capacity as a New Jersey State Trooper, <br><br> DANIEL VALENTI, individually and in his official capacity as a New Jersey State Trooper, <br><br> EDDY OTANO, individually and in his official capacity as a New Jersey State Trooper, <br><br> CRAIG M. DENARDO, individually and in his official capacity as a New Jersey State Trooper, <br><br> JEFFREY R. FISCHETTI, individually and in his official capacity as a New Jersey State Trooper, <br><br> *Defendants*. | Civil Action No. 24-10076 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com
*Attorneys for Plaintiffs*

## LOCAL CIVIL RULE 10.1 STATEMENT

The mailing addresses of the parties to this action are:

David L. Burg
32 Windswept Lane
Freehold, NJ  07728

Association of New Jersey Rifle & Pistol Clubs, Inc.
5 Sicomac Road, Suite 292
North Haledon, New Jersey 07508

Matthew Platkin
Office of the Attorney General
RJ Hughes Justice Complex
25 Market Street, Box 080
Trenton, New Jersey 08625

Patrick J. Callahan
Office of the Superintendent
New Jersey State Police
P.O. Box 7068
West Trenton, New Jersey 08628

Raymond S. Santiago
Office of the Monmouth County Prosecutor
132 Jerseyville Avenue
Freehold, New Jersey 07728

Anthony Dzugan
520 Old Adamston Rd.
Brick, NJ 08723

Daniel Valenti
(address unknown)

Eddy Otano
26 Dayton St.
Elizabeth, NJ 07202

Craig M. Denardo
4606 Spring St.
Wall Township, NJ 07753

Jeffrey R. Fischetti
10 Fawn Place
Matawan, NJ 07747

# INTRODUCTION

**The Second Amendment's plain text . . . presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense.**

*New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2135 (2022).

1.      The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II (emphasis added).  When the People, by enacting that amendment, enshrined in their fundamental charter the right to "carry weapons in case of confrontation" for the "core lawful purpose of self-defense," *District of Columbia v. Heller*, 554 U.S. 570, 592, 630 (2008), they did not mean to leave the freedom to exercise that right at the mercy of the very government officials whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id*. (Emphasis in original.). 16 months ago, the United States Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2135 (2022), holding that the Second Amendment guarantees the right of the people to carry handguns in public for self-defense.

2.      The State of New Jersey has, apparently, not gotten the message. New Jersey is piling on its suppression of the fundamental right to keep and bear arms using every possible means, including its grossly unconstitutional Extreme Risk Protective Order Act of 2018 ("ERPO Act"), N.J.S.A, 2C:58-20, et seq. – a law that fails even the most basic requirements of Due Process and treats the Second Amendment worse than a second class right.  The ERPO Act treats the Second Amendment as if it does not exist.

3.      After *Bruen* was decided, having lost the ability to suppress the fundamental right to bear arms in public through its now dead and buried "justifiable need" requirement,[1] in December 2022, New Jersey shifted gears and made a permit to carry a handgun utterly useless. New Jersey passed a new law, Assembly Bill A4769, which allows a permit holder to carry almost *nowhere* in the State. New Jersey has simply changed its approach from one unconstitutional law that allowed "no one" to carry to another unconstitutional law that allows on to carry "nowhere." Notwithstanding the clear ruling of the United States Supreme Court, New Jersey simply does not want ordinary people to carry handguns in public—as is their fundamental right to do.

4.      On the same day A4769 was signed into law, two lawsuits (now consolidated) were commenced in this Court challenging the law under the Second Amendment and other provisions of the Constitution: *Siegel v. Platkin*, 22-cv-7463 and *Koons v. Platkin*, 22-cv-7464.

5.      On May 16, 2023, Chief Judge Renee Bumb entered a preliminary injunction in the consolidated actions, enjoining large portions of A4769. *See Koons v. Platkin*, 673 F.Supp.3d 515 (D.N.J. 2023).

6.      Notwithstanding last year's stark judicial reminder that New Jersey may not disregard the fundamental right to keep and bear arms, New Jersey persists in its relentless attack on the rights of New Jerseyans through its ERPO Act.

7.      The ERPO Act allows certain petitioners, including police agencies, to completely disarm an individual based on an *ex parte* record, based on hearsay, and based on a nebulous and weak standard of proof identified merely as "good cause."

8.      It was on such a thin *ex parte* record that the New Jersey State Police Defendants suddenly showed up at the home of long time attorney David Burg with a Temporary Extreme

---

[1] *See Mazahreh v. Platkin*, 1:20-cv-17598, ECF No. 51 (D.N.J. Oct. 12, 2022).

Risk Protective Order ("TERPO") and seized all of his firearms, rendering him utterly defenseless and entirely unable to exercise his fundamental right to keep and bear arms.

9.      What was Mr. Burg's heinous offense? Mr. Burg had several days earlier exercised his right of lawful self-defense by *showing* the muzzle of his lawfully carried Glock 43x micro-pistol to a driver who had been relentlessly and threateningly pursuing Mr. Burg for miles.

10.      But the other driver got to the police first, and falsely reported that Mr. Burg had pointed a gun at him unprovoked. So rather than investigate the incident in a systematic and even-handed manner, the State Police Defendants, in an astonishingly unprofessional and irresponsible manner, applied the "Guy With The Gun Is The Bad Guy" Presumption.

11.      The result was that Mr. Burg was summarily disarmed and denied his fundamental constitutional rights without any opportunity to tell his side of the story and without the Defendants having had to satisfy even the most basic obligation to create a reliable and rigorous record.

12.      If this can happen to Mr. Burg, this can happen to any law abiding New Jerseyan who holds a Permit to Carry a Handgun and urgently needs to exercise her fundamental right to lawful self-defense outside her home.

13.      The ERPO law is simply another means for New Jersey to disregard *Bruen* and unconstitutionally suppress the fundamental right to bear arms in public for lawful self-defense.

14.      Accordingly, Mr. Burg and Association of New Jersey Rifle & Pistol Clubs, Inc., (collectively "Plaintiffs"), by and through the undersigned attorneys, file this Complaint against the above-captioned Defendants, in their official capacities as the state officials responsible under New Jersey law for administering and enforcing the State's laws and regulations governing the possession of firearms, as well as individual members of the New Jersey State Police who participated in and specifically perpetrated this outrageous conduct. Plaintiffs bring this facial and

as applied challenge seeking declaratory and *immediate and urgent* injunctive relief: a declaration that New Jersey's ERPO Act, which suppresses both the fundamental right to bear arms in public as set forth in *Bruen* and also suppresses the fundamental right to keep arms as set forth in both *Bruen* and *Heller*, is unconstitutional and injunctive relief precluding its enforcement and directing the return of Burg's firearms. *Bruen* shut the door on lower courts' outright defiance of *District of Columbia v. Heller,* 554 U.S. 570 (2008), and Plaintiffs simply ask this Court to enforce their fundamental rights.

15.    The ERPO Act is part of the State of New Jersey's blatant refusal to accept the ruling of the United States Supreme Court. On June 24, 2022, the day after the *Bruen* decision was handed down, New Jersey Governor Phil Murphy announced his plan to undermine the ruling in every way possible. The ERPO Act is simply a part of that plan to make good on that unlawful promise.

16.    In support of their Complaint against Defendants, Plaintiffs hereby allege as follows:

## JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction over Plaintiffs' claim under 28 U.S.C. §§ 1331 and 1343.

18.    Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, and 2202 and 42 U.S.C. §§ 1983 and 1988.

19.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) & (b)(2).

## PARTIES

20.     Plaintiff David L. Burg is a law-abiding resident and citizen of the United States and the State of New Jersey. He resides at 32 Windswept Lane, Freehold, New Jersey 07728. He is a member of Association of New Jersey Rifle & Pistol Clubs, Inc.

21.     Plaintiff Association of New Jersey Rifle & Pistol Clubs, Inc. ("ANJRPC") is a not-for-profit membership corporation, incorporated in the State of New Jersey in 1936, which represents its members. Its address is 5 Sicomac Road, Suite 292, North Haledon, New Jersey 07508. ANJRPC represents the interests of target shooters, hunters, competitors, outdoors people, and other law-abiding firearms owners. Among ANJRPC's purposes is aiding such persons in every way within its power and supporting and defending the people's right to keep and bear arms, including the right of its members and the public to carry handguns in public for self-defense. New Jersey's ERPO law allowing the State of New Jersey to summarily disarm New Jerseyans with little to know no Due Process is thus a direct affront to ANJRPC's central mission. ANJRPC has tens of thousands of members who reside in New Jersey, including David Burg. ANJRPC brings the claim herein on behalf of its members.

22.     Defendant Matthew Platkin is the Attorney General of New Jersey. As Attorney General, he exercises, delegates, or supervises all the powers and duties of the New Jersey Department of Law and Public Safety, including the Division of State Police within that Department, which is responsible for executing and enforcing New Jersey's laws and regulations governing the possession and carry of handguns. Defendant Platkin also supervises and directs the activities of local law enforcement, including setting standards, procedures, and guidelines for the processing and issuance of firearms permits. Finally, as chief law enforcement official in the State, Defendant Platkin exercises supervisor authority over all State prosecutors' offices. His official

address is Office of the Attorney General, RJ Hughes Justice Complex, 25 Market Street, Box 080, Trenton, New Jersey 08625. He is being sued in his official capacity.

23.     Defendant Patrick J. Callahan is the Superintendent of the New Jersey Division of State Police. As Superintendent, subject to the oversight and supervision of the Attorney General, he exercises, delegates, or supervises all the powers and duties of the New Jersey Division of State Police, including executing and enforcing New Jersey's laws and regulations governing the possession and carry of handguns. His official address is Office of the Superintendent, New Jersey State Police, P.O. Box 7068, West Trenton, New Jersey 08628. He is being sued in his official capacity.

24.     Defendant Raymond S. Santiago is the Monmouth County Prosecutor. As Prosecutor, subject to the oversight and supervision of the Attorney General, he exercises, delegates, or supervises all the powers and duties of the Monmouth County Prosecutor's Office, including executing and enforcing New Jersey's laws and regulations governing the possession and carry of handguns, and proceedings under the ERPO law. His official address is Office of the Monmouth County Prosecutor, 132 Jerseyville Avenue, Freehold, New Jersey 07728. He is being sued in his official capacity.

25.     Defendant Anthony Dzugan is a Trooper with the New Jersey Division of State Police. Defendant Dzugan participated and is participating under color of law in the events giving rise to this Complaint as more fully set forth below. His address is 520 Old Adamston Rd., Brick, NJ 08723. He is being sued in his official and his individual capacity.

26.     Defendant Daniel Valenti is a Detective with the New Jersey Division of State Police. Defendant Valenti participated and is participating under color of law in the events giving

rise to this Complaint as more fully set forth below. His address is unknown at this time. He is being sued in his official and his individual capacity.

27.    Defendant Eddy Otano is a Trooper with the New Jersey Division of State Police. Defendant Otano participated and is participating under color of law in the events giving rise to this Complaint as more fully set forth below. His address is 26 Dayton St., Elizabeth, NJ 07202. He is being sued in his official and his individual capacity.

28.    Defendant Craig M. Denardo is a Detective Sergeant with the New Jersey Division of State Police. Defendant Denardo participated and is participating under color of law in the events giving rise to this Complaint as more fully set forth below. His address is 4606 Spring St., Wall Township, NJ 07753. He is being sued in his official and his individual capacity.

29.    Defendant Jeffrey R. Fischetti is a Trooper with the New Jersey Division of State Police. Defendant Fischetti participated and is participating under color of law in the events giving rise to this Complaint as more fully set forth below. His address is 10 Fawn Place, Matawan, NJ 07747. He is being sued in his official and his individual capacity.

## FACTUAL ALLEGATIONS

**New Jersey's Continuing and Comprehensive Infringement on the Fundamental Right to Keep and Bear Arm, Including the Right to Carry Arms in Public**

**A.    Prior Law Governing the Public Possession of Handguns**

30.    Since 1966, New Jersey had made it impossible for nearly all law-abiding New Jerseyans to carry handguns in public for lawful self-defense.

31.    New Jersey law generally forbids any person to "ha[ve] in his possession any handgun . . . , without first obtaining a permit to carry the same." N.J.S.A. 2C:39-5(b). While state law provides certain exceptions to this general ban—including one for "keeping or carrying [a

firearm] about [one's] place of business, residence, premises or other land owned or possessed by him," *id.* § 2C:39-6(e), these exceptions do not allow the carrying of a handgun in public, either openly or concealed, without first obtaining a permit. Violating this ban is a crime in the second degree, punishable by between five and ten years imprisonment and a fine of up to $150,000. *Id.* §§ 2C:39-5(b), 2C:43-3(a)(2), 2C:43-6(a)(2).

32.    New Jersey accordingly allows an individual to carry a handgun in public only if he first obtains a permit to do so (a "Handgun Carry Permit"). Prior to the enactment of the A4769, to be eligible for a Handgun Carry Permit, an applicant had to satisfy certain statutory criteria. For example, he must not have been convicted of any crime or offense involving an act of domestic violence; must not be addicted to controlled substances, mentally infirm, or an alcoholic; must not be subject to certain restraining orders; and must not be listed on the FBI's Terrorist Watchlist. *Id.* §§ 2C:58-4(c); 2C:58-3(c). An applicant must also pass criminal and mental health background checks, *id.* § 2C:58-4(c), must provide three reputable references who certify that he "is a person of good moral character," *id.* § 2C:58-4(b), and must have satisfied extensive firearms safety training requirements, N.J.A.C. 13:54-2.4(b).

33.    In addition to these rigorous screening and training requirements, a law-abiding citizen could only be granted a Handgun Carry Permit if he demonstrated "that he has a justifiable need to carry a handgun." N.J.S.A. 2C:58-4(c).

34.    N.J.S.A. 2C:58-4(c) previously provided that "in the case of a private citizen," the "justifiable need" requirement was satisfied only if the applicant could "specify in detail the urgent necessity for self-protection, as evidenced by specific threats or previous attacks, which demonstrate a special danger to the applicant's life that cannot be avoided by reasonable means other than by issuance of a permit to carry a handgun." *Id.* The statute further provided that

"[w]here possible the applicant shall corroborate the existence of any specific threats or previous attacks by reference to reports of such incidents to the appropriate law enforcement agencies." *Id.*

35.    In further interpreting this "justifiable need" requirement, New Jersey's Supreme Courts determined that "[g]eneralized fears for personal safety are inadequate, and a need to protect property alone does not suffice." *In re Preis*, 573 A.2d 148, 152 (N.J. 1990).

36.    Accordingly, typical law-abiding citizens of New Jersey—the vast majority of responsible citizens who cannot "demonstrate a special danger to [their] life" as "evidenced by specific threats or previous attacks," N.J.S.A. 2C:58-4(C)—effectively remained subject to a flat ban on carrying handguns outside the home.

37.    As a result of the previous "justifiable need" rule, nearly all New Jerseyans were, for generations, denied the basic, fundamental right to carry a firearm in lawful self-defense in public.

**B.    The *Bruen* Decision**

38.    On June 23, 2022, the United States Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* swept away the notion that States could materially interfere with the fundamental right to carry a handgun in public for self-defense. The Court made clear that, *by default*, the people have a fundamental right to carry handguns, and they have the right to do so in most places and under most circumstances. That is*, public carry of handguns is the rule, not the exception*.

39.    In *Bruen*, the Court invalidated the most common and most easily and widely abused method of denying the fundamental right to carry a handgun—the requirement that an applicant for a permit to carry a handgun show some sort of "need." Under New York law (the subject of the claims in *Bruen*) the requirement was called "proper cause."  As explained above,

New Jersey called it "justifiable need." Regardless of the name, the Supreme Court did not merely rule that requiring a showing of "need' is unconstitutional. The Court ruled that any scheme that broadly impairs the right to carry a handgun would be unconstitutional. The Court was unambiguous that a general right to carry is the clear law of the land, and any attempt to interfere with that right is automatically constitutionally suspect.

40.    On October 12, 2022, in *Mazahreh v. Platkin*, 1:20-cv-17598, ECF No. 51 (Oct. 12, 2022), the Supreme Court's ruling in *Bruen* was made directly applicable to New Jersey's "justifiable need" requirement, and the "justifiable need" requirement was explicitly held unconstitutional. *Id*.

### C.    New Jersey Announces "Massive Resistance" to *Bruen*

41.    On June 24, 2022, one day after the *Bruen* decision, New Jersey Governor Phil Murphy held a press conference. (https://www.youtube.com/watch?v=EJ9ZJR-Sk24). Like his predecessors in the Southern states in 1954 in the wake of *Brown v. Board of Education*, Governor Murphy blasted the Supreme Court's decision upholding fundamental constitutional rights and vowed to find ways to undermine and/or circumvent the effect of the ruling. In addition to announcing a wish list of new legislation aimed at, once again, preventing law abiding individuals from carrying handguns, Governor Murphy signed Executive Order 299 (https://nj.gov/infobank/eo/056murphy/pdf/EO-299.pdf) which declared the *Bruen* decision "deeply flawed," stated that "the vast majority of New Jerseyans do not support relaxing restrictions on who may carry a gun in public," and directed all State agencies to "immediately review their statutes, rules, regulations, and program requirements to identify actions that may be taken under existing authority determining whether, and in what manner, firearms may be carried,

displayed, or otherwise regulated." *Id*. In other words, the Governor announced his clear intention to resist the Supreme Court's ruling in *Bruen* in any and every way possible.

      **D.**      **New Jersey's Massive Resistance: A4769 -- The New "Justifiable Need"**

42.      After New York fired its first salvo at the broadside of *Bruen* and failed to sink it, New Jersey followed suit.

43.      On December 22, 2022, Governor Murphy signed into law A4769—New Jersey's own attempt to blatantly defy the United States Supreme Court and its ruling in *Bruen*.

44.      A4769 picked up where "justifiable need" left off. A4769 so comprehensively precluded the lawful carry of handguns in public by ordinary, law-abiding individuals that one would not know, by reading A4769, that the Supreme Court ever decided the *Bruen* case.

45.      *Bruen* holds that the Constitution precludes a State from broadly preventing law abiding from carrying a handgun in public. A4769 did exactly that which the Constitution forbids.

46.      It did so in several ways. First, A4769 created an enormous list of places and circumstances that are off limits for carrying a handgun, including in one's own car and, presumptively, all private property.

47.      The effect of this is that there are almost no places in the State of New Jersey, other than one's own home, where a person can lawfully carry handgun—exactly the state of affairs under "justifiable need" prior to *Bruen*.

48.      Second, A4769 imposed massive fees increases and the requirement to purchase liability insurance, both calculated to impose a substantial financial burden as an obstacle to exercising the right to bear arms in public.

49.      Third, A4769 created new and onerous procedures and standards for obtaining a Handgun Carry Permit—all obvious obstacles interposed in the way of exercising the fundamental

right to bear arms in public.

50.     Taken as a whole, A4769 can be seen exactly for what it is. Having lost the ability to prevent ordinary individuals from exercising their fundamental constitutional right to carry handguns in public for self-defense by forcing them to show to the arbitrary satisfaction of a public official that they really "need" to carry a handgun, Governor Murphy and the New Jersey Legislature have, in a state of sheer panic, thrown together the worst, most onerous, most prejudicial, and most unconstitutional new "justifiable need" proxy they could imagine.

**E.      New Jersey Gets Sued For "Justifiable Need II"**

51.     On the same day A4769 was signed into law, two lawsuits (now consolidated) were commenced in this Court challenging the law under the Second Amendment and other provisions of the Constitution: *Siegel v. Platkin*, 22-cv-7463 and *Koons v. Platkin*, 22-cv-7464.

52.     On May 16, 2023, Chief Judge Renee Bumb entered a preliminary injunction in the consolidated actions, enjoining large portions of A4769. *See Koons v. Platkin*, 673 F. Supp. 3d 515 (D.N.J. 2023).

53.     Notwithstanding last year's stark judicial reminder that New Jersey may not disregard the fundamental right to keep and bear arms, New Jersey persists in its relentless attack on the rights of New Jerseyans through its ERPO law.

**F.      The ERPO Act**

54.     N.J.S.A. 2C:58-21, entitled provides in pertinent part as follows:

          . . .

          "Family or household member" means a spouse, domestic partner as defined in section 3 of P.L.2003, c. 246 (C.26:8A-3), partner in a civil union couple as defined in section 2 of P.L.2006, c. 103 (C.37:1-29), or former spouse, former domestic partner, or former partner in a civil union couple, or any other person who is a present household member or was at any time a household member; a person with whom the respondent has a child in

common, or with whom the respondent anticipates having a child in common if one of the parties is pregnant; or a current or former dating partner.

. . .

"Petitioner" means a family or household member or law enforcement officer.

"Recent" means within six months prior to the date the petition was filed.

55.    N.J.S.A. 2C:58-23, entitled "**Petition for temporary extreme risk protective order; affidavit or examination under oath of petitioner and witnesses; fees; notice**" provides in pertinent part as follows:

a.    Except as provided in subsection l. of this section, a petitioner may file a petition, as prescribed by the Administrative Director of the Courts, for a temporary extreme risk protective order in the court in accordance with the Rules of Court alleging that the respondent poses a significant danger of bodily injury to self or others by having custody or control of, owning, possessing, purchasing, or receiving a firearm. The petition shall be heard by the court in an expedited manner.

Petition forms shall be readily available at the courts, and at State, county, and municipal law enforcement agencies.

. . .

A petitioner may apply for relief under this section in accordance with the Rules of Court.

b.    A petition for a temporary extreme risk protective order shall include an affidavit setting forth the facts tending to establish the grounds of the petition, or the reason for believing that they exist, and, to the extent available, the number, types, physical description, and locations of any firearms and ammunition currently believed by the petitioner to be controlled or possessed by the respondent.

. . .

d.    The court, before issuing a temporary extreme risk protective order, shall examine under oath the petitioner and any witness the petitioner may produce. The court, in lieu of examining the petitioner and any witness, may rely on an affidavit submitted in support of the petition.

e.  A judge shall issue the order if the court finds good cause to believe that the respondent poses an immediate and present danger of causing bodily injury to the respondent or others by having custody or control of, owning, possessing, purchasing, or receiving a firearm.

f.  . . . the court shall consider whether the respondent:

   (1) has any history of threats or acts of violence by the respondent directed toward self or others;

   (2) has any history of use, attempted use, or threatened use of physical force by the respondent against another person;

   (3) is the subject of a temporary or final restraining order or has violated a temporary or final restraining order issued pursuant to the "Prevention of Domestic Violence Act of 1991," P.L.1991, c. 261 (C.2C:25-17 et seq.);

   (4) is the subject of a temporary or final protective order or has violated a temporary or final protective order issued pursuant to the " Victim's Assistance and Survivor Protection Act ," P.L.2015, c. 147 (C.2C:14-13 et al.);

   (5) has any prior arrests, pending charges, or convictions for a violent indictable crime or disorderly persons offense, stalking offense pursuant to section 1 of P.L.1992, c. 209 (C.2C:12-10), or domestic violence offense enumerated in section 3 of P.L.1991, c. 261 (C.2C:25-19);

   (6) has any prior arrests, pending charges, or convictions for any offense involving cruelty to animals or any history of acts involving cruelty to animals;

   (7) has any history of drug or alcohol abuse and recovery from this abuse; or

   (8) has recently acquired a firearm, ammunition, or other deadly weapon.

g.  The temporary extreme risk protective order shall prohibit the respondent from having custody or control of, owning, purchasing, possessing, or receiving firearms or ammunition, and from securing or holding a firearms purchaser identification card or permit to purchase a handgun pursuant to N.J.S.2C:58-3, or a permit to carry a handgun pursuant to N.J.S.2C:58-4 during the period the protective order is in effect and shall order the respondent to surrender firearms and ammunition in the respondent's custody or control, or which the respondent possesses or owns, and any

firearms purchaser identification card, permit to purchase a handgun, or permit to carry a handgun held by the respondent in accordance with section 7 of P.L.2018, c. 35 (C.2C:58-26). Any card or permit issued to the respondent shall be immediately revoked pursuant to subsection f. of N.J.S.2C:58-3.

h.  A temporary extreme risk protective order issued under this section shall remain in effect until a court issues a further order.

56.    Notably, 2C:58-23, which provides for the issuance of a Temporary Extreme Risk Protective Order ("TERPO") disarming a respondent, does not provide for service of the petition on the respondent.

57.    2C:58-23(b) permits the petition to rely solely on an "affidavit setting forth the facts *tending to establish* the grounds of the petition, or the *reason for believing* that they exist . . ." [Emphasis added.]

58.    2C:58-23(d) permits the court to issue a TERPO disarming a respondent based solely on such an affidavit without examination of any witness.

59.    2C:58-23(e) permits the court to issue a TERPO disarming a respondent upon a finding based on the undefined and nebulous standard of "good cause."

60.    2C:58-23(e) permits the court to issue a TERPO disarming a respondent based solely on unproven criminal allegations.

61.    2C:58-23(e) permits the court to issue a TERPO disarming a respondent based solely on cruelty to animals.

62.    2C:58-23(e) permits the court to issue a TERPO disarming a respondent based solely on the fact that the respondent acquired a firearm, ammunition, or other deadly weapon within the previous six months.

63.    2C:58-23(e) permits the court to issue a TERPO disarming a respondent based on any *single factor* set forth in subsection (f).

64.    N.J.S. 2C:58-24 entitled "**Hearing for a final extreme risk protective order; evidence**" provides in pertinent part as follows:

a.    A hearing for a final extreme risk protective order shall be held in the Superior Court in accordance with the Rules of Court within 10 days of the filing of a petition pursuant to subsection a. of section 4 of P.L.2018, c.35 (C.2C:58-23). A copy of the petition shall be served on the respondent in accordance with the Rules of Court.

b.    . . . If the court finds by a preponderance of the evidence at the hearing that the respondent poses a significant danger of bodily injury to the respondent's self or others by having custody or control of, owning, possessing, purchasing, or receiving a firearm, the court shall issue an extreme risk protective order.

c.    When deciding whether to issue the order, the court shall consider the factors enumerated in subsection f. of section 4 of P.L.2018, c. 35 (C.2C:58-23), as well as any other relevant evidence.

d.    An extreme risk protective order issued pursuant to this section shall prohibit the respondent from having custody or control of, owning, purchasing, possessing, or receiving a firearm. . . .

65.    N.J.S.A. 2C:58-24 provides for the issuance of a Final Extreme Risk Protective Order ("FERPO") and suffers from all of the same defects as the TERPO procedure except that it requires the court to make findings by a mere preponderance of the evidence.

66.    N.J.SA. 2C:58-26, entitled "Temporary or final extreme risk protective order; surrender of firearms and ammunition; search warrant; petition for return of surrendered firearms or ammunition" provides in pertinent parts as follows:

a.    When a temporary or final extreme risk protective order is issued pursuant to section 4 or 5 of P.L.2018, c. 35 (C.2C:58-23 or C.2C:58-24), the court shall order the respondent to surrender to the local law enforcement agency all firearms and ammunition in the respondent's custody or control, or which the respondent owns or possesses, and any firearms purchaser identification card, permit to purchase a handgun, or permit to carry a handgun held by the respondent. The court also shall notify the respondent that the respondent is prohibited from purchasing firearms or ammunition or applying for a firearms purchaser identification card, permit to purchase a handgun, or permit to carry a handgun.

b. If the petition for the temporary extreme risk protective order indicates that the respondent owns or possesses any firearms or ammunition, the court shall issue a search warrant with the temporary or final extreme risk protective order and the law enforcement officer who serves the order shall request that all firearms and ammunition immediately be surrendered.

(1) The respondent immediately shall surrender, in a safe manner, all firearms and ammunition in the respondent's custody or control, or which the respondent owns or possesses, and any firearms purchaser identification card, permit to purchase a handgun, or permit to carry a handgun held by the respondent to the control of the law enforcement officer.

67.    N.J.S.A. 2C:58-3(c)(10) then goes on to make the subject of an ERPO ineligible for a firearms permit.

68.    N.J.S.A. 2C:58-30 provides for the entry of certain FERPO and TERPO data into an "Electronic Central Registry."

69.    The foregoing provisions of law allow the complete disarmament of an individual based on the flimsiest of procedures.

**G.    The ERPO Act Violates the Fundamental Constitutional Rights of Plaintiffs.**

**1) Plaintiff David Burg**

**Background**

70.    Plaintiff David Burg is a 67 year old attorney who resided in California until he and his wife moved their family to New Jersey in June 2021.

71.    In June 1980, he graduated Magna cum Laude and Phi Beta Kappa from the University of California at Los Angeles (UCLA) with a Bachelor of Arts degree in History and, after working for several years as a musician, in May 1987, he graduated from the University of California Berkeley School of Law (Boalt Hall) with a Juris Doctor degree.

72.    Burg took and passed the California Bar Examination in July 1987, and he was admitted to practice before the Courts of the State of California in December 1987.    He

subsequently was admitted to practice before the United States Court of Appeals for the Ninth Circuit, and the United States District Courts for the Central, Northern, and Eastern Districts of California, and the District of Arizona.

73.    In July 2022, he passed the New Jersey Bar Examination and, in December 2022, he was admitted to practice before the courts of the State of New Jersey and the United States District Court for the District of New Jersey.  He remains in good standing with all of these courts.

74.    Burg has practiced as a business and entertainment litigator continuously since 1987.  He was employed in-house by NBCUniversal from 2006 to 2016, and during most of that time served as Senior Vice President, Litigation, overseeing all global litigation for the Universal Studios film, home entertainment, studio facilities, and theme park businesses.

75.    Since 2019, Burg has been a member of Mandavia Ephraim & Burg LLP, a boutique business and entertainment litigation firm based in Los Angeles.  He has no record of discipline throughout his nearly 37-year legal career.

76.    In November 1996, Burg married Julie Bonett from Manalapan, New Jersey.  They then settled in Los Angeles where they raised their three sons (now ages 23, 22, and 20).  In June 2021, Burg and his wife moved their family to Monmouth County, New Jersey, near Julie's immediate and extended family.

77.    Burg is a passionate student and lover of the United States Constitution, and he is particularly devoted to its Second Amendment as he fervently believes the right to keep and bear arms as enshrined by that document ensures the safety, security, and freedom of the American people.  He owns a small number of firearms for this purpose.

78.     Moreover, Burg is an American Jew who is acutely aware of the history of the Jewish people – particularly whenever Jews have been unarmed and therefore unable to defend themselves from virulent anti-semitism.

79.     Following the decision of the United States Supreme Court in *Bruen* in 2022, Burg decided to apply for a New Jersey Permit to Carry a Handgun ("PTC") to protect himself and his family from the risk of violence.  He recognizes that law enforcement personnel cannot be everywhere all the time and thus law-abiding individuals may need to be in a position to engage in lawful self-defense when violent encounters arise.

80.     In March 2024, Burg took and passed the required PTC course at the Union Hill Gun Club, and in April 2024 the State of New Jersey (through the Howell Township Police Department) issued a PTC to him.

81.     Burg regularly carried his Glock 43x handgun outside his residence from the time the PTC was issued to him in April 2024 until July 17, 2024, when all of his firearms were taken from him by the State of New Jersey.

**Burg's Life and Safety are Threatened by an Aggressive Road-Rager**

82.     In addition to being a practicing attorney, Burg is a lifelong musician.  Shortly after moving to New Jersey in 2021, Burg formed what is now an 8-piece classic rock band (Generations) in which he serves as Musical Director and plays bass and saxophone.

83.     In late 2023, Generations was booked to perform at the Plumsted Township Independence Day fireworks celebration that later was scheduled to take place on July 13, 2024. The band worked hard to prepare for this performance, and Burg and his bandmates were quite excited by the opportunity to perform for three hours on the Ocean County stage before a large audience.

84.    To this end, shortly after 3pm on Saturday, July 13, 2024, Burg set out in his GMC Yukon from his residence in Howell Township heading to New Egypt in Plumsted Township, where the Independence Day fireworks celebration would take place.  He took Route 33 westbound and exited at Route 537 southwest-bound.  He passed CentraState Hospital and not far beyond that the road narrows to one lane in each direction with quite narrow shoulders through dense woods.  There was a steady flow of moderate traffic in both directions, and the southwest-bound side on which Burg was traveling was moving at about 60 mph.

85.    Suddenly, Burg noticed in his rearview mirror a small car had barreled up on him and was tailgating his vehicle – frequently within a car's length from him. This made Burg quite uncomfortable, including because his precious musical instruments were in the rear of his vehicle, and he was concerned they would be irreparably damaged if he had to unexpectedly brake and this tailgating car rear-ended him.  So Burg gently tapped his brakes trying to communicate his desire for more space.  The other drive did not back off.  He tried once again and this person reacted by tailgating, weaving, and gesticulating toward Burg even more aggressively.

86.    Burg wanted nothing further to do with this person, so on two occasions he activated his right turn signal, searched for a place to pull onto the right shoulder to let him pass, pulled as far onto the right shoulder as possible, and slowed or stopped to let him pass.  On both such occasions, however, rather than passing Burg, the other driver pulled his vehicle onto the shoulder directly behind Burg's in an aggressive and confrontational manner, and slowed or stopped with the apparent intention of exiting his vehicle to confront Burg.

87.    Burg felt quite threatened by this behavior so, on both occasions, he immediately returned his vehicle into the flow of traffic.  And on both occasions the other driver darted his

vehicle directly behind Burg's so as not to allow another car between them and continued chasing Burg down Route 537.

88.    Although Burg was generally unfamiliar with the area, he knew his destination in Plumsted Township was a short distance off Route 537. He also anticipated there would be significant law enforcement personnel present for the Plumsted Township fireworks event. So Burg decided to do his best to ignore this apparent lunatic who was chasing him down Route 537, and to keep driving toward his destination.

89.    Unfortunately, however, Burg encountered a red light at what he now knows to be the intersection of Route 526. At that point, Route 537 opens into two southwest lanes of traffic plus a left-turn lane. Approaching the intersection, Burg saw that the road-raging driver initially indicated he was turning right so Burg proceeded *away* from him into the left lane of traffic. Once Burg did this, however, the other driver suddenly veered to the left of Burg's vehicle in an attempt to overtake Burg's vehicle, forcing Burg to brake to avoid hitting him.

90.    The other driver then pulled his vehicle into the left-turn lane directly next to Burg's, and when Burg stopped for the red light there were several stopped cars in front of him, a line of stopped cars to Burg's right, and cars stopped behind him. The other driver then deliberated stopped short in the left-turn lane immediately to his left – completely trapping Burg – despite several car lengths of open space in front of his vehicle.

91.    Although Burg's light remained red, the left-turn arrow quickly turned green in the other driver's lane but he did not move, though no cars were in front of him, thereby blocking cars behind him from proceeding to turn left.

92.    Burg initially inched his vehicle forward trying to gauge if there was enough room to escape – but there was not. The other driver – who appeared to be a young man in his mid-

twenties – promptly rolled down his passenger-side window and began incessantly shouting and cursing at me, including threats to "kick your ass."

93.    This confinement and verbal confrontation continued for about 30 seconds. Throughout this stressful time period Burg believed the other driver would either physically attack the 67 year old Burg right there or, when the light finally turned green, he would dart back into traffic directly behind Burg's vehicle as he had been doing and continue chasing Burg down the highway looking for a more opportune place to physically attack him.

94.    Initially, Burg did not roll down his car window but instead repeatedly shouted back at the other driver to "leave me the fuck alone" and "get the hell out of here."  The driver did neither.

95.    Terrified that the driver would try to drag Burg from the car and beat him bloody – either right then or further down the road – near the end of this approximately 30 seconds of confinement, Burg rolled down his window, turned to his left to face the other driver, carefully drew his firearm from its holster, raised it in his right hand, with his finger off the trigger, and held it inside his vehicle mid-body slightly above the height of the window while pointing it at the vehicle that was entrapping him just long enough to utter the words "leave me the fuck alone asshole."  Burg had no intention whatsoever of firing his weapon, which he could not physically have done without first deliberately retracting the slide to chamber a round, as he did not have a round in the chamber of the pistol.  Rather, his sole purpose was to instill fear in this other driver that Burg was capable of defending himself, if necessary.

96.    Immediately after Burg produced his weapon, the other driver finally began driving forward.  This caused Burg to turn back to face forward, and he then realized the light in his direction finally had turned green.

97.    Burg began driving forward and, as the other vehicle no longer was visible in his rearview mirror, he believed the other driver had proceeded to turn left from the left turn lane; in fact, however, the other driver suddenly stopped short after Burg's vehicle had departed and veered right across two lanes of traffic before making a right turn into a restaurant parking lot just beyond that intersection.

98.    This dangerous and extreme move to the right by the other driver made it clear that the only reason he had pulled into the left turn lane was to continue his aggressive course of threats and intimidation toward Burg.

99.    Burg was gratified that briefly producing his weapon in this manner had quickly and effectively diffused an ominous and extremely threatening situation.  He continued his journey without further incident, and Generations set up and performed a three-hour show leading into a raucous fireworks celebration.

**Burg is Summarily Disarmed Without Notice Simply for Engaging in Lawful Self-Defense**

100.    Burg and his wife are members of the Freehold Jewish Center located on Broad Street in Freehold Borough.  Throughout their membership they regularly have volunteered to assist with the synagogue's Wednesday evening BINGO games which provides significant financial support for its operations.

101.    Thus, on Wednesday evening, July 17, 2024, Burg and his wife were at Freehold Jewish Center assisting with BINGO when his wife's cell phone rang.  It was their son Daniel who happened to be home alone at their residence that evening. Daniel said that around dusk a large number of vehicles from the New Jersey State Police ("NJSP") and Howell Township Police had approached their home on a residential side street, and a number of officers had knocked on the front door looking for Burg.

102.    Burg and his wife instructed their son to give the officers Burg's cell phone number. Burg then stepped away from BINGO and went outside to the synagogue parking lot where he received a call from a NJSP officer who said he wanted to talk with Burg about a "road rage" incident that had occurred on Route 537 the previous Saturday (four days earlier). Burg said he would be happy to speak with him and arranged for the NJSP to meet him in the synagogue parking lot.

103.    It was dark by the time several NJSP vehicles arrived at Freehold Jewish Center shortly thereafter. The first NJSP officer who approached Burg reiterated that they merely wanted to talk with him about the incident mentioned on the phone. Burg believed they were investigating the incident and responded that he would be happy to tell them exactly what occurred, which he did. It was not until after Burg had told them what had occurred on July 13 that one of the officers then served him with a Temporary Extreme Risk Protective Order (TERPO) which had been issued without Burg's knowledge or participation earlier that day. The officers also served Burg with a complaint charging him with one second degree and two fourth degree crimes.

104.    The lead officer, Defendant Detective Daniel Valenti, assured Burg that, if he cooperated with the NJSP that evening, then they would treat him respectfully. Burg did fully cooperate with the NJSP that evening as he did not want to be embarrassed in front of his fellow congregants or family. Moreover, Burg firmly believed then – and continues to firmly believe now – that he had not broken the law at all on July 13 but rather had acted entirely within his legal rights under those circumstances.

105.    Burg then accompanied a number of NJSP officers – including Defendant Valenti and Defendant Trooper Anthony Dzugan (who had signed the TERPO petition) – to Burg's home and, once there, Burg produced to them all of his firearms and his ammunition, which they

catalogued, removed from his home, and placed in their vehicle pursuant to the TERPO. Burg

then drove alone in his own vehicle to the NJSP headquarters in Hamilton, where he spent several

hours primarily with Defendants Valenti and Dzugan.

106.    During Burg's time with Defendant Valenti that night, Defendant Valenti also

showed Burg a NJSP document Defendant Valenti described as a "charging sheet" (or words to

that effect) which he said he was using to determine the charges to file against Burg. Burg noticed

the document stated that PTC holders are not permitted to carry a holstered handgun while driving.

This directly contradicts the preliminary injunction issued by Judge Bumb in *Koons* and *Siegel*.

107.    Burg told Defendant Valenti this was directly contrary to the information conveyed

to him during the NJSP-sanctioned PTC course he had taken, and Defendant Valenti responded by

acknowledging that the document was in error. In fact, when Burg asked him for a copy of the

document Defendant Valenti refused because he said the document was inaccurate.

108.    After Burg had spent several hours at the NJSP headquarters on the night of July

17, 2024, Defendant Dzugan walked him to the front door. Before letting him out of the building

he extended his hand to shake Burg's and said, "I never thought I'd be saying this to you but I'm

really sorry."

109.    The TERPO petition was submitted by Defendant Dzugan as Petitioner, and the

TERPO was granted entirely on the basis of Defendant Dzugan's hearsay affidavit. Nothing in the

affidavit was based on personal knowledge.

110.    No testimony, written or live, was submitted by any witness to the events that

formed the basis of the TERPO.

111.    No witness gave live testimony or was examined by the court that issued the

TERPO.

**Subsequent Proceedings**

112.    The TERPO with which Burg was served on July 17 required both "the Petitioner and the Respondent" to appear for a "final hearing" in the Monmouth County Superior Court on July 26, 2024 at 9:00 am.  This hearing time subsequently was changed to July 24, 2024 at 1:30 pm, and Burg then received from the Monmouth County Prosecutor's office a subpoena ordering him to appear in the Monmouth County Superior Court "for a Petition to impose a Final Extreme Risk Protective Order on the 24th day of July, 2024, at 1:30 pm."  He also received a notice from Monmouth County Superior Court Assignment Judge Marc C. Lemieux ordering him to appear at the "Monmouth County Courts" for an "extreme risk protective order hearing" on July 24, 2024 at 1:30 pm.

113.    On July 23, 2024, Assistant Prosecutor Jessica Sparano from the Monmouth County Prosecutor's Office called Burg on his cellphone apparently to discuss the Final Extreme Risk Protective Order ("FERPO") hearing scheduled for the following day.  During the telephone conversation Burg unequivocally told Sparano that he would not waive his statutory right to a FERPO hearing within 10 days after issuance of the TERPO, and that he fully intended to proceed with the FERPO hearing as scheduled the following day.

114.    Sparano responded by telling Burg this was quite unusual as ERPO respondents like him typically face concurrent criminal charges and, for this reason, almost invariable voluntarily waive their statutory right to a FERPO hearing within 10 days.  Burg responded by firmly reiterating that he would not waive his right to a FERPO hearing within 10 days, and told her he would be appearing in court for the FERPO hearing as scheduled the following day.

115.    Sparano's candid admission demonstrates one of the pernicious effects of the ERPO Act's design. The Act's lack of an immunity feature tends to coerce respondents to waive their

right to a quick 10-day return date for a FERPO hearing because they will usually have a parallel criminal proceeding pending in which their FERPO testimony can otherwise be used against them, and they would not want to create such a FERPO record prior to their criminal trial.

116.    This design compels a Hobson's Choice between a person's Fifth Amendment rights and his statutory right to a quick 10-day FERPO return date. Thus, the existence of an expedited procedure for the respondent is illusory.

117.    Later on July 23, 2024, Sparano emailed Burg written discovery concerning the matter.  Upon his review of this material Burg learned that the NJSP had known his identity, age, and address since shortly after the incident was reported to them on July 13 – but that the NJSP nevertheless had deliberately decided not to speak with him to learn his side of the story before obtaining the TERPO behind his back and concurrently charging him with serious crimes.

118.    When Burg arrived in court for the FERPO hearing on July 24, 2024, Sparano handed him a CD containing four videos comprising additional discovery produced by the State: (1) a surveillance video from a 7 Eleven store located diagonally across the intersection from where the incident took place on July 13; (2) a short clip taken by the complainant, Mossimo Importuna, while driving behind Burg on July 13; (3) Importuna's videotaped statement to the NJSP made at his residence on July 14, 2024, upon which the TERPO petition was based; and (4) Burg's videotaped statement made at the NJSP headquarters on July 17.  Burg was afforded an opportunity to view these videos immediately before the FERPO hearing in a room adjacent to the courtroom.

119.    The TERPO petition signed by Defendant Dzugan alleged that the 7 Eleven video "cooperates [sic]" Importuna's complaint against Burg.  This is incorrect. In fact, the 7 Eleven video entirely corroborated and supported Burg's statements about what had occurred.  The video shows Importuna's vehicle pulling right up next to Burg's and stopping in the left turn lane well

short of the intersection, and then it shows Importuna rapidly crossing over two lanes to make a right turn from the left turn lane once the light turned green.

120.    Moreover, during Importuna's videotaped statement to Defendants Valenti and Dzugan made at his residence on July 14, 2024 Importuna admitted that he "sometimes" drives "like a dick."  Importuna also admitted that, on one of the occasions on July 13 when Burg pulled over on Route 537 trying to get him to pass me, he "opened [his] car door" and was "about to get out," – apparently seeking a physical confrontation with Burg along the highway.

121.    Yet neither Defendant Valenti nor Defendant Dzugan had followed up by asking Importuna what he intended to accomplish by physically confronting me in traffic on Route 537.  And, like the inaccurate TERPO petition, Importuna falsely claimed during his videotaped statement that Burg already had his firearm drawn in his direction from the moment Importuna pulled his vehicle next to Burg's at the intersection with Route 526, and that it remained so throughout the entire 30-second confrontation.  Again, however, neither Defendant Valenti nor Defendant Dzugan asked Importuna, if that was the case, then why did he not simply drive away much sooner (as he obviously had every opportunity to do).

122.    After watching these videos on July 24, 2024, Burg proceeded into the courtroom for his scheduled FERPO hearing.  He had with him a large stack of collated exhibits that he had prepared to use while cross-examining Detective Valenti (who was present for the FERPO hearing despite the fact that Trooper Dzugan is the petitioner).  When the judge called the case, Burg clearly and unequivocally stated on the record that he would not waive his statutory right to a FERPO hearing within 10 days after issuance of the TERPO – and he explained why this was his position.  Nevertheless, and over his objection – but with no objection by the petitioner or the

Monmouth County Prosecutor – the Court adjourned the FERPO hearing until early September 2024, well after the statutory 10-day period had expired.

123.    In fact, the Judge indicated that he had never before seen an ERPO case in which the respondent did *not* waive his right to a 10 day FERPO return date.

124.    On September 28, 2024, the Monmouth County Superior Court further adjourned the FERPO hearing until November 12, 2024.  To date, none of Burg's Constitutionally-protected property has been returned to him.

**The Individual Defendants' Participation in the Unconstitutional ERPO Act Proceedings Against Plaintiff Burg**

125.    Defendant Dzugan led and/or participated in the investigation that resulted in the unconstitutional proceedings under the ERPO Act.

126.    Defendant Dzugan failed to properly and fully investigate by, among other things, failing to speak with Plaintiff Burg to obtain his version of the facts prior to initiating the unconstitutional proceeding under the ERPO Act. The information obtained from Burg would have cast material doubt on the accuracy and validity of the TERPO petition.

127.    Defendant Dzugan is the petitioner in the unconstitutional ERPO proceedings.

128.    Defendant Dzugan participated in the service and firearm seizure associated with the unconstitutional TERPO.

129.    Defendant Valenti led and/or participated in the investigation that resulted in the unconstitutional proceedings under the ERPO Act.

130.    Defendant Valenti failed to properly and fully investigate by, among other things, failing to speak with Plaintiff Burg to obtain his version of the facts prior to initiating the unconstitutional proceeding under the ERPO Act. The information obtained from Burg would have cast material doubt on the accuracy and validity of the TERPO petition.

131. Defendant Valenti participated in the service and firearm seizure associated with the unconstitutional TERPO.

132. Defendant Otano participated in the investigation that resulted in the unconstitutional proceedings under the ERPO Act.

133. Defendant Otano failed to properly and fully investigate by, among other things, failing to speak with Plaintiff Burg to obtain his version of the facts prior to the initiation of the unconstitutional proceeding under the ERPO Act. The information obtained from Burg would have cast material doubt on the accuracy and validity of the TERPO petition.

134. Upon information and belief, Defendant Otano coordinated in and participated in preparation and submission of the record submitted to the court in obtaining the unconstitutional TERPO.

135. Defendant Denardo participated in the investigation that resulted in the unconstitutional proceedings under the ERPO Act.

136. Defendant Denardo failed to properly and fully investigate by, among other things, failing to speak with Plaintiff Burg to obtain his version of the facts prior to the initiation of the unconstitutional proceeding under the ERPO Act. The information obtained from Burg would have cast material doubt on the accuracy and validity of the TERPO petition.

137. Defendant Denardo participated in the service and firearm seizure associated with the unconstitutional TERPO.

138. Upon information and belief, Defendant Denardo coordinated in and participated in preparation and submission of the record submitted to the court in obtaining the unconstitutional TERPO.

139.    Defendant Fischetti participated in the investigation that resulted in the unconstitutional proceedings under the ERPO Act.

140.    Defendant Fischetti failed to properly and fully investigate by, among other things, failing to speak with Plaintiff Burg to obtain his version of the facts prior to the initiation of the unconstitutional proceeding under the ERPO Act. The information obtained from Burg would have cast material doubt on the accuracy and validity of the TERPO petition.

141.    Upon information and belief, Defendant Fischetti coordinated in and participated in preparation and submission of the record submitted to the court in obtaining the unconstitutional TERPO.

### 2) Plaintiff ANJRPC

142.    Plaintiff ANJRPC has members, including Plaintiff Burg, who have been and will be subject to the unconstitutional procedures and defects built into the ERPO Act as set forth herein.

### COUNT ONE
### Deprivation of Plaintiffs' Rights Under U.S. CONST. amends. II and XIV

143.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

144.    The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Second Amendment applies against the States via the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

145.    The carrying of handguns in public for self-defense and the possession of firearms in the home fall plainly within the text of the Second Amendment under *Heller* and *Bruen*.

146.    Therefore, the State bears the burden to demonstrate that any restriction on the public carry of handguns or the possession of firearm in the home is consistent with the nation's historical tradition of firearms regulation,

147.    Defendants cannot make the required showing for large portions of the ERPO Act.

148.    Defendants cannot show that seizing a person's firearms, even temporarily, in an *ex parte* proceeding is consistent with the historical tradition of firearms regulation.

149.    Defendants cannot show that seizing a person's firearms, even temporarily, based partially or entirely on hearsay evidence is consistent with the historical tradition of firearms regulation.

150.    Defendants cannot show that seizing a person's firearms, even temporarily, based on a standardless showing of mere "good cause" is consistent with the historical tradition of firearms regulation.

151.    Defendants cannot show that seizing a person's firearms based on a showing of mere preponderance of the evidence is consistent with the historical tradition of firearms regulation.

152.    Defendants cannot show that seizing a person's firearms, even temporarily, based on a standard lower than clear and convincing evidence is consistent with the historical tradition of firearms regulation.

153.    Defendants cannot show that seizing a person's firearms, even temporarily, in a summary proceeding is consistent with the historical tradition of firearms regulation.

154.    Defendants cannot show that seizing a person's firearms, even temporarily, based on a mere showing of unproven charges or arrests is consistent with the historical tradition of firearms regulation.

155.    Defendants cannot show that seizing a person's firearms, even temporarily, based on a mere showing that the person acquired a firearm, ammunition, or other deadly weapon within the past six months is consistent with the historical tradition of firearms regulation.

156.    Defendants cannot show that the foregoing are consistent with the historical tradition of firearms regulation.

157.    Accordingly, the ERPO Act is invalid under the Second Amendment both on its face and as applied to Plaintiff Burg and one or more members of ANJRPC.

**COUNT TWO**
**Deprivation of Plaintiffs' Rights Under U.S. CONST. amend. XIV**
**(Due Process of Law)**

158.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

159.    The Due Process Clause of the Fourteenth Amendment provides in pertinent part: "No State shall ... deprive any person of life, liberty, or property, without due process of law[.]"

160.    Depriving a person of a fundamental constitutional right, even temporarily, in an *ex parte* proceeding violates the Due Process Clause of the Fourteenth Amendment.

161.    Depriving a person of a fundamental constitutional right, even temporarily, based partially or entirely on hearsay evidence violates the Due Process Clause of the Fourteenth Amendment.

162.    Depriving a person of a fundamental constitutional right, even temporarily, based on a standardless showing of mere "good cause" violates the Due Process Clause of the Fourteenth Amendment.

163.    Depriving a person of a fundamental constitutional right based on a showing of mere preponderance of the evidence violates the Due Process Clause of the Fourteenth Amendment.

164.    Depriving a person of a fundamental constitutional right, even temporarily, based on a standard lower than clear and convincing evidence violates the Due Process Clause of the Fourteenth Amendment.

165.    Depriving a person of a fundamental constitutional right, even temporarily, in a summary proceeding violates the Due Process Clause of the Fourteenth Amendment.

166.    Depriving a person of a fundamental constitutional right, even temporarily, based on a mere showing of unproven charges or arrests violates the Due Process Clause of the Fourteenth Amendment.

167.    In view of the foregoing, the ERPO Act violates the Due Process Clause of the Fourteenth Amendment and is unconstitutional on its face and as applied to Plaintiff Burg and one or more members of ANJRPC.


**COUNT THREE**
**Deprivation of Plaintiffs' Rights Under U.S. CONST. amend. XIV and V**
**(Right Against Self Incrimination)**

168.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

169.    The Fifth Amendment provides in pertinent part: "No person . . .  shall be compelled in any criminal case to be a witness against himself[.]"

170.    The ERPO Act fails to provide immunity for testimony of a respondent provided in connection with the FERPO hearing as to use in a subsequent criminal proceeding.

171.    The elements that support a TERPO or FERPO may also give rise to criminal charges, which they did in the case of Plaintiff Burg.

172.    Because the ERPO Act fails to provide immunity as to a respondent's testimony in a FERPO hearing, a respondent must choose between the statutory right to a FERPO hearing with

10 days of the issuance of a TERPO or waiver of the respondent's Fifth Amendment right against self-incrimination.

173.    The ERPO Act violates the Fifth Amendment and is therefore unconstitutional on its face and as applied to Plaintiff Burg and one or more members of ANJRPC.

## COUNT FOUR
### Damages Against the Individual Defendants – 42 U.S.C. §1983

174.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

175.    The foregoing conduct of Defendants Dzugan, Valenti, Otano, Denardo, and Fischetti ("Individual Defendants") was undertaken under color of law and has subjected and continues to subject Plaintiff Burg to a deprivation of his rights under the foregoing provisions of the United States Constitution.

176.    Plaintiff Burg is therefore entitle to damages and an award counsel fees against the Individual Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an order and judgment:

a.    Declaring N.J.S. 2C:58-23, 2C:58-24, 2C:58-26, and 2C:58-3(c)(10) unconstitutional and thus devoid of any legal force or effect;

b.    Temporarily, preliminarily, and permanently enjoining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of the injunction, (1) from enforcing N.J.S. 2C:58-23, 2C:58-24, 2C:58-26, and 2C:58-3(c)(10); (2) directing that ERPO proceedings and their products be expunged and removed from the electronic central registry of N.J.S.A. 2C:58-30 and not be used in connection with any firearm permitting process; and (3) directing the return of Plaintiff David L Burg's firearms, ammunition, and firearms permits;

c.    Awarding Plaintiff David L. Burg compensatory, consequential, and punitive damages against the Individual Defendants;

d.    Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action, pursuant to 42 U.S.C. § 1988; and

e.    Granting such other and further relief as this Court deems just and proper.

Dated: October 25, 2024                            Respectfully submitted,

                                                   s/ Daniel L. Schmutter
                                                   Daniel L. Schmutter
                                                   HARTMAN & WINNICKI, P.C.
                                                   74 Passaic Street
                                                   Ridgewood, New Jersey 07450
                                                   (201) 967-8040
                                                   (201) 967-0590 (fax)
                                                   dschmutter@hartmanwinnicki.com
                                                   *Attorneys for Plaintiffs*

**DECLARATION OF COUNSEL PURSUANT TO LOCAL CIV. R. 11.2**

The undersigned hereby states that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

However, the matter arises from the same on-going concerted effort of Defendants Platkin and Callahan to circumvent the United States Supreme Court decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2135 (2022) and suppress the fundamental right to bear and carry arms in public, and therefore this matter is a related case to the consolidated cases *Koons v. Platkin* and *Siegel v. Platkin*, no. 22-cv-7464-RMB-AMD and should therefore be heard by the same Judge.

I declare under penalty of perjury that the foregoing is true and correct.


s/ Daniel L. Schmutter
Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com
*Attorney for Plaintiffs*


Dated: October 25, 2024